William J. Doyle (SBN 188069)
Chris W. Cantrell (SBN 290874)
**DOYLE APC**
550 West B Street, Fourth Floor
San Diego, CA 92101
Telephone: (619) 736-0000
Facsimile: (619) 736-1111

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

R. TODD LOGUE ,

                                    Plaintiff,

v.

COVIDIEN, L.P., COVIDIEN, INC.,
COVIDIEN LTD, COVIDIEN PLC,
COVIDIEN HOLDING INC.,
COVIDIEN, LLC, MEDTRONIC, INC.,
MEDTRONIC USA, INC.,
MEDTRONIC PL, SOFRADIM
PRODUCTION SAS, SOFRADIM
CORP., SURGICAL SOLUTIONS
GROUP and UNITED STATES
SURGICAL GROUP

                                    Defendants.

Case No.:   **5:22-cv-00878**

COMPLAINT

1. STRICT LIABILITY – FAILURE TO WARN

2. NEGLIGENCE

PLAINTIFF R. TODD LOGUE hereby files this Complaint against COVIDIEN, L.P., COVIDIEN, INC., COVIDIEN LTD, COVIDIEN PLC, COVIDIEN HOLDING INC., COVIDIEN, LLC (f/k/a Tyco Healthcare Group LP), MEDTRONIC, INC., MEDTRONIC USA, INC., MEDTRONIC PL, SOFRADIM PRODUCTION SAS, SOFRADIM CORP, SURGICAL SOLUTIONS GROUP and UNITED STATES SURGICAL GROUP (collectively, "Defendants" or "Covidien") and shows unto the Court as follows:

## PARTIES

### Plaintiff Logue

1. Plaintiff R. Todd Logue is a 61-year old resident citizen of the State of California residing in the City of Upland, California. On June 25, 2018, Plaintiff received a 45 x 30 cm piece of Parietene™ Macroporous Mesh for the repair of his recurrent ventral hernia. The surgery was performed at Kaiser Permanente Fontana Medical Center in Fontana, California. Parietene™ Macroporous Mesh (hereinafter "Parietene") manufactured, designed, sold and marketed by the Defendants.. In 2021, Plaintiff began to experience significant vaginal pain and difficulty urinating. Dr. Michael Margolis, a urogynecologist, examined Plaintiff and found that the Monarc sling had eroded through the vagina and was choking Plaintiff's urethra created significant urinary problems. On August 20, 2021, Plaintiff underwent surgery by Dr. Margolis at El Camino Hospital in Los Gatos, California to remove the eroded vaginal sling and repair the damage it had caused by Plaintiff's urinary system.

### Defendants

2. COVIDIEN, LP, ("Covidien") is a Limited Partnership organized under the laws of Delaware and has its principal place of business in Mansfield, Massachusetts. Covidien manufactures, distributes, and services medical devices, including medical devices known as the Parietex Optimized Composite Mesh and Parietex Hydrophilic Anatomical Mesh, medical devices implanted to treat persons like Plaintiff for hernias. The general partner of Covidien is Covidien Holding Inc., a for-profit corporation

1  organized under the laws of Delaware with its principal place of business in Mansfield,

2  Massachusetts.

3      3.  Defendant COVIDIEN, INC. ("Covidien Inc.") is a Delaware corporation

4  with its principal place of business at 15 Hampshire Street, Mansfield, Bristol County,

5  Massachusetts, and offices and facilities in Bedford and Waltham, Middlesex County,

6  Massachusetts, and Boston, Suffolk County, Massachusetts.  All acts and omissions of

7  Covidien Inc. as described herein including but not limited to those resulting in the

8  design, manufacture, marketing, labeling, distribution, sale and placement of its hernia

9  mesh Device at issue in the instant suit into Middlesex County, were done by its agents,

10 servants, employees and/or owners, acting in the course and scope of their

11 representative agencies, services, employments and/or ownership. At all times material

12 hereto, Covidien Inc. did business in Massachusetts.

13     4.  Defendant COVIDIEN, LTD. ("Covidien ltd.") is a Bermuda public limited

14 company with its principal place of business in Bermuda, and offices in Bedford and

15 Waltham, Middlesex County, Massachusetts.  All acts and omissions of Covidien ltd. as

16 described herein including but not limited to those resulting in the design, manufacture,

17 marketing, labeling, distribution, sale and placement of its hernia mesh Device at issue

18 in the instant suit into Middlesex County, were done by its agents, servants, employees

19 and/or owners, acting in the course and scope of their representative agencies, services,

20 employments and/or ownership. At all times material hereto, Covidien ltd. did business

21 in Massachusetts.

22     5.  Defendant COVIDIEN PLC ("Covidien plc") is an Irish public limited

23 company with its principal place of business in Massachusetts at 15 Hampshire Street,

24 Mansfield, Bristol County, Massachusetts, and offices in Bedford and Waltham,

25 Middlesex County, Massachusetts.  All acts and omissions of Covidien plc as described

26 herein including but not limited to those resulting in the design, manufacture,

27 marketing, labeling, distribution, sale and placement of its Hernia Mesh Device at issue,

28 were done by its agents, servants, employees and/or owners, acting in the course and

scope of their representative agencies, services, employments and/or ownership. At all times material hereto, Covidien plc did business in Massachusetts.

6.    Defendant COVIDIEN HOLDING INC., ("Covidien Holdings") is a corporation that is incorporated under the laws of the State of Delaware.  Covidien Holdings has its principal place of business at 15 Hampshire Street, Mansfield, Bristol County, Massachusetts, and offices in Bedford and Waltham, Middlesex County, Massachusetts. Covidien Holdings has a registered agent in Massachusetts at CT Corporation System, 155 Federal Street, Ste. 700, Boston, Massachusetts, 02110.

7.    Defendant COVIDIEN, LLC (d/b/a Covidien LP) ("Covidien llc"), is a Delaware limited partnership with its principal place of business at 15 Hampshire Street, Mansfield, Bristol County, Massachusetts, and offices in Bedford and Waltham, Middlesex County, Massachusetts.

8.  Defendant SURGICAL SOLUTIONS GROUP ("Covidien Surgical") is a Delaware corporation with its principal place of business in Colorado, and is a wholly owned subsidiary of Covidien Ltd.  All acts and omissions of Covidien Surgical as described herein were done by its agents, servants, employees and/or owners, acting in the course and scope of their respective agencies, services, employments and/or ownership. At all times material hereto, Covidien Surgical did business in Massachusetts.

9.  Defendant UNITED STATES SURGICAL CORP. ("U.S. Surgical") is a Delaware corporation with its principal place of business in Connecticut, and is a wholly owned subsidiary of Covidien plc.  U.S. Surgical is registered to do business in Massachusetts, with a registered agent in the Commonwealth.  It also shares the same corporate directors as Covidien US.  All acts and omissions of U.S. Surgical as described herein including but not limited to those resulting in the design, manufacture, marketing, labeling, distribution, sale and placement of its Hernia Mesh Device here, were done by its agents, servants, employees and/or owners, acting in the course and

1    scope of their representative agencies, services, employments and/or ownership.  At all

2    times material hereto, U.S. Surgical did business in Massachusetts.

3        10.    Defendant SOFRADIM PRODUCTION SAS ("Sofradim Production")

4    is a French company with its principal place of business at 116 Avenue Du Formans,

5    Trevoux, France, 01600.  All acts and omissions of Sofradim as described herein were

6    done by its agents, servants, employees and/or owners, acting in the course and scope

7    of their respective agencies, services, employments and/or ownership.

8        11.    Defendant SOFRADIM CORP. ("Sofradim") is a company with its

9    principal place of business in Mansfield, Bristol County, Massachusetts and offices in

10    Wrentham, Norfolk County, Massachusetts. All acts and omissions of Sofradim Corp.

11    as described herein were done by its agents, servants, employees and/or owners, acting

12    in the course and scope of their respective agencies, services, employments and/or

13    ownership. Defendant MEDTRONIC USA INC. and MEDTRONIC plc f/k/a

14    Medtronic Inc. & Covidien plc, (collectively referred to as "Medtronic") is a

15    corporation that is incorporated under the laws of the State of Minnesota, with offices

16    and facilities at 12 Gill Street, Woburn, Middlesex County, Massachusetts and Boston,

17    Suffolk County, Massachusetts. It is the corporate parent/stockholder of COVIDIEN

18    and all of its subsidiaries and entities.  All acts and omissions of Medtronic as described

19    herein were done by its agents, servants, employees and/or owners acting in the course

20    and scope of their respective agencies, services, employments and/or ownership.

21        12.    Sofradim and its parent and affiliates were acquired by Covidien or its

22    predecessor and are now wholly owned by Covidien.  Since its acquisition by Covidien,

23    Sofradim has been a business unit or division of Covidien.  Since its acquisition by

24    Covidien, Sofradim has been referred to as the "Trevoux Plant" of Covidien and is

25    considered a manufacturing facility for the surgical device business unit of Covidien.

26    Sofradim is registered with the U.S. Food and Drug Administration ("FDA") as an

27    "establishment," which is the functional equivalent of a manufacturing facility or

28    production plant.  Covidien or its corporate affiliates are listed with the FDA as the

1  "owner/operator" of Sofradim, which makes Covidien "directly responsible for the

2  activities" of Sofradim.  Since the acquisition of Sofradim by Covidien, the officers,

3  managers and employees of Sofradim have been employees of Covidien.

4      13.    In January 2015, Medtronic acquired Covidien LP. From the date of

5  acquisition, Medtronic has been responsible for the actions of Covidien and exercised

6  control over Covidien's functions specific to the oversight of and compliance with

7  applicable safety standards relating to and including the Parietene  Mesh sold in the

8  United States. In such capacity, Medtronic committed or allowed to be committed

9  tortious and wrongful acts, including the violation of numerous safety standards relating

10  to device manufacturing, quality assurance/control, and conformance with design and

11  manufacturing specifications. Medtronic's misfeasance and malfeasance, including

12  failure to warn the public of known problems with their products, caused Plaintiff to

13  suffer injury and damages.

14      14.    Covidien and Medtronic (collectively referred to as the "Covidien

15  Defendants") are individually, jointly and severally liable to Plaintiff for damages

16  suffered by Plaintiff arising from their design, manufacturing, marketing, labeling,

17  distribution, sale, and placement of the defective Parietene  Mesh at issue in this suit.

18  All acts were effectuated directly and indirectly through Defendants' respective agents,

19  servants, employees, officers, and owners, acting within the course and scope of their

20  representative agencies, services, employments, and/or ownership.

21      15.    Covidien and Medtronic (collectively referred to as "Defendants") are

22  vicariously liable for the acts and omissions of their respective employees and/or agents

23  who were at all times acting on Defendants' behalf and within the scope of their

24  employment or agency.

25                    **VENUE AND JURISDICTION**

26      16.    Damages sought in this matter are in excess of $75,000.00. Subject matter

27  jurisdiction is proper under 28 U.S.C. § 1322.

28

17.    This Court has diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a). This Court has diversity subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), because it is a civil action in which the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different States.

18.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and (c) because the events or omissions giving rise to Plaintiff's claims occurred in this district. Specifically, the Plaintiff currently resides and resided at all times relevant hereto in this district. Further, all of Plaintiff's hernia mesh implant surgeries as well as all surgeries to treat complications from the hernia mesh implants occurred in this district.

19.    Defendants have conducted and continue to conduct, substantial business in the State of California and in this District; distribute Covidien Products in this District; receive substantial compensation and profits from sales of Covidien Products in this District; and make material omissions and misrepresentations and breaches of warranties in this District, so as to subject them to personal jurisdiction in this District.

20.    Covidien and Medtronic are registered to transact business in the State of California.

## FACTS

**Plaintiff**

21.    On June 25, 2018, Plaintiff underwent surgery at Kaiser Fontana Medical Center in Fontana, California to repair a recurrent ventral hernia. The surgery, performed by Jun Frank Yamanishi, MD, involved repairing the recurrent ventral hernia using a 45 x 30 cm piece of Parietene Macroporous Mesh, Lot No. SRK1494X and Cat. No. PPM4530. Parietene Mesh is manufactured by Covidien.

22.    Approximately four months after the implant surgery, Plaintiff began to experience significant complications from the mesh including being hospitalized for nine-days in October 2018 after developing an enterocutaneous fistula. Going into 2019, the fistula worsened, eventually developing into a "high output" abdominal fistula

with "drainage of 800 to 1000cc per day [of] liquid with solid particles" and "mesh exposed on the edges of the wound." After failing to respond to conservative treatment, Plaintiff had to undergo surgery on March 4, 2019 at Kaiser Fontana in an effort to repair the fistula. This was an extremely invasive surgery as a small bowel resection was required to repair the fistula.

23. While still hospitalized and recovering from the March 4, 2019 surgery to repair the enterocutaneous fistula, the Plaintiff developed another intestinal fistula tract which required immediate surgery. On March 13, 2019, Plaintiff underwent another exploratory laparotomy, primary repair of the intestinal fistula and debridement of the wound edge at Kaiser Fontana. During the surgery, Dr. Yamanishi found some remnants of the Parietene Mesh which he excised as well as debriding some necrotic tissue. Dr. Yamanishi excised four segments of mesh from the fistula measuring 3.9 x 1.8 x 1.5 cm in aggregate. Plaintiff was hospitalized a total of 30 days, from March 4, 2019 to April 3, 2019 recovering from these two procedures.

24. Even after these surgeries, Plaintiff continued to experience complications and developed multiple enterocutaneous fistulas in late 2019. On January 30, 2020, Plaintiff underwent surgery to resect three separate fistula openings and lysis of adhesions at Kaiser Fontana. This was an extremely invasive surgery requiring three separate small bowel resections and significant lysis of adhesions. Plaintiff was hospitalized for a total of 25 days (Jan. 30 thru Feb. 24) recovering from this procedure.

25. Defendants' Parietene Mesh Implants caused Plaintiff significant and permanent injuries including chronic infection, adhesions and multiple chronic fistulas necessitating multiple small bowel resections and significant time spent wearing fistula ostomy bags.. To date, Plaintiff has spent a total of 129 days as a hospital inpatient for treatment of these injuries.

**DEFENDANTS' PARIETENE MESH**

26. Covidien/Medtronic's Parietene^TM Macroporous Mesh 45 x 30 cm is a monofilament polypropylene mesh intended for use in the extraperitoneal repair of

1  hernias or other fascial defects. The Covidien Defendants represented the mesh has

2  surface density of 46 g/m² and a pore size of 2.0 x 2.4 mm.  Sofradim Productions

3  obtained clearance to market Parietene Mesh through the FDA's 510(k) process in

4  2014. Parietene Mesh (K142091) by representing that the Parietene Macroporous Mesh

5  was "substantially equivalent" to previously 510(k) cleared Parietene Mesh PROLENE

6  Soft Mesh (K001122) and Parietene Flat Sheet Mesh (K140941).

7       27.    Defendants Coviden/Medtronic sought and obtained FDA clearance to

8  market their Parietene Mesh under Section 510(k) of the Medical Device Amendment to

9  the Food, Drug and Cosmetics Act. The "510(k) clearance process" refers to Section

10  510(k) of the 1976 Medical Device Amendments to the Federal Food, Drug and

11  Cosmetic Act (MDA). Under this process, medical device manufacturers are only

12  required to notify the FDA at least 90 days before they market a device that is alleged

13  to be "substantially equivalent" to a device the FDA had approved for sale before 1976

14  (when the MDA was enacted).

15       28.    No clinical testing or clinical study is required to gain FDA clearance

16  under this process. Instead, a given device was supposed to demonstrate substantial

17  equivalence to a predicate medical device that the FDA had approved for sale prior to

18  the MDA enactment (pre-1976).

19       29.    Subsequent amendments to the MDA allowed for 510(k) clearance of

20  implants deemed "substantially equivalent" to post-MDA, 510(k)-cleared devices. In

21  short, medical devices could now be cleared within 90, without any testing for safety

22  and efficacy, solely by alleging the device is substantially equivalent to a device that itself

23  was cleared without any safety or efficacy testing.

24       30.    Therefore, clearance under the 510(k) process does not equate to FDA

25  approval of the cleared medical device. The 510(k) process is not a formal review for

26  safety or efficacy. No clinical testing or clinical study is required to gain FDA clearance

27  under this process.

28       31.    At the request of the FDA in 2012, the National Institute of Health (NIH)

conducted a thorough review of the 510(k) process, reaching the following major conclusion:

> **The 510(k) clearance process is not intended to evaluate the safety and effectiveness of medical devices with some exceptions. The 510(k) process cannot be transformed into a pre-market evaluation of safety and effectiveness so long as the standard for clearance is substantial equivalence to any previously cleared device.**

32.    The NIH explained: "The assessment of substantial equivalence does not require an independent demonstration that the new device provides a 'reasonable assurance of safety and effectiveness.'" Further, the NIH even pointed out that the classification of predicate devices approved for sale prior to 1976 "did not include any evaluation of the safety and effectiveness of individual medical devices . . .Thus it is common for devices to be cleared through the 510(k) program by being found substantially equivalent to devices that were never individually evaluated for safety and effectiveness, either through the original device classification program or through the 510(k) process."

33.    As the NIH noted, the use of devices that were never evaluated for safety and efficacy as predicate devices gives no assurances of safety and efficacy for the applicant 510(k) device. However, Defendants and other hernia mesh manufacturers, exploited the 510(k) process even more by using mesh implants that were eventually removed from the market due to safety and efficacy problems as the predicate devices to get 510(k) clearance.

34.    Upon information and belief, no formal review for safety or efficacy was ever conducted for Parietene Macroporous Mesh.

35.    The Covidien Defendants were responsible for the research, design, development, testing, manufacture, production, marketing, promotion, distribution and sale of the Parietene Mesh, including providing the warnings and instructions concerning this product.

36.    The primary intended purpose for which Defendants designed Parietene Mesh was for use in the repair of hernias. This was the reason that the Parietene Mesh

was implanted in Plaintiff.

**DEFECTS OF PARIETENE MESH IMPLANTS**

37.     Like most hernia mesh products, Parietene Mesh is comprised of polypropylene. Despite claims by the manufacturers of hernia mesh implants that polypropylene is inert, scientific evidence shows it is biologically incompatible with human tissue, and promotes an immune response in much of the population receiving it. The immune response to polypropylene promotes degradation and contracture of the mesh, as well as the surrounding tissue, and can contribute to the formation of severe adverse reactions to these products including a chronic inflammatory reaction.

38.     Many manufacturers of Hernia Mesh Devices use a polypropylene resin that is not intended to be used in permanent medical implants and/or contact with internal body fluids or tissues. The suppliers of the raw polypropylene include Material Safety Data Sheets (MSDS) with the polypropylene, as required by law, that prohibits the polypropylene from being used in these manners.

39.     The Parietene Mesh is defective due to its high rates of failure, injury, and complications, their failure to perform as intended, their requirement of frequent and often debilitating re-operations, and their cause of severe and irreversible injuries, conditions, and damage to numerous patients, including Plaintiff.

40.     The specific nature of Parietene Mesh's defects include, but are not limited to, the following:

   a) The use of polypropylene in Parietene Mesh and the immune reactions resulting from such material, cause adverse reactions and injuries.

   b) Adverse reactions to the polypropylene in Parietene Mesh consist of adhesions, injuries to nearby organs, nerves, or blood vessels, and other complications, including infection, chronic pain, and hernia recurrence.

   c) Parietene Mesh have a propensity to degrade or fragment over time, causing a chronic inflammatory and fibrotic reaction, and resulting in continuing injury over time as the polypropylene acts as a chronic

10
COMPLAINT

trigger for inflammation.

d)  Upon information and belief, Defendants utilized various substandard and/or adulterated polypropylene resins in Parietene Mesh.

e)  The weave of the polypropylene mesh produces very small interstices allowing bacteria to enter and hide from white blood cells and macrophages—the host defenses designed to eliminate bacteria. The bacteria also secrete an encasing biofilm, serving to further protect them from destruction by white blood cells and macrophages. In addition, some bacteria are capable of degrading polypropylene.

f)  Polypropylene is always impure; there is no pure polypropylene. Polypropylene contains about 15 additional compounds that leach from the product and are toxic to tissue, enhancing the inflammatory reaction and the intensity of fibrosis.

g)  Scanning electron microscopy has shown mesh to not be inert, with degradation leading to flaking, fissuring, and release of toxic compounds. This enhances theinflammatory and fibrotic reactions.

h)  By 1998 at the latest, polypropylene mesh was known to shrink 30-50%.

i)  Polypropylene is subject to oxidation by acids produced during the inflammatory reaction, causing degradation and loss of compliance.

j)  Mesh porosity is important for tissue ingrowth, with low porosity decreasing tissue incorporation. Porosity also affects the inflammatory and fibrotic reaction. With mechanical stress, the effective porosity is decreased.

k)  After implantation in the human body, polypropylene is known to depolymerize, cross-link, undergo oxidative degradation by free radicals, and stress crack.

l)  The large surface area of polypropylene promotes wicking of fluids and bacteria, and is a "bacterial super highway" providing a safe haven for bacteria.

m)  Common complications associated with polypropylene include restriction of abdominal wall mobility and local wound disturbances. Failures of polypropylene often include persistent and active inflammatory processes, irregular or low formation of scar tissue and unsatisfying integration of the mesh in the regenerative tissue area.

**DEFENDANTS' ACTS & OMISSIONS REGARDING PARIETENE MESH**

41.    At all materials times, the Covidien Defendants were responsible for designing, manufacturing, producing, testing, studying, inspecting, labeling, marketing, advertising, selling, promoting, and distributing Parietene Mesh, as well as providing warnings/information about the mesh.

42.    Parietene Mesh was defectively designed and manufactured; and was also defective as marketed due to inadequate warnings, instructions, labeling and/or inadequate testing, despite Defendants' knowledge of Parietene Mesh' lack of safety.

43.    Defendants had independent obligations to timely and adequately disclose scientific and medical information about Parietene Mesh; and to warn of the risks and side effects of these devices as soon they were aware of them.  Neither the Covidien Defendants did so.

44.    Defendants also knew or should have known that Parietene Mesh unreasonably exposed Plaintiff to the risk of serious harm, while conferring no benefit over available feasible and safer alternatives that did not present the same risks and adverse effects.

45.    Defendants made claims regarding the benefits of implanting Parietene Mesh but minimized or omitted its risks and adverse effects. Although Defendants knew or should have known that these claims were false and misleading, they failed to adequately disclose the true health  consequences and the true risks and adverse effects of Parietene Mesh.

46.    At all material times, Defendants failed to provide sufficient warnings and instructions that would have put Plaintiff, his health care providers, and the general public on notice of the dangers and adverse effects caused by implantation of Parietene Mesh.

47.    Defendants have marketed and continue to market Parietene Mesh as a safe, effective and reliable implant. Further, Defendants continue to market Parietene Mesh as safer and more effective than available feasible alternative treatments for

1    hernias, and other competing products. Those alternatives have existed at all material

2    times, and have always presented less frequent and less severe risks and adverse effects

3    than Parietene Mesh.

4        48.    The risks of Parietene Mesh's design outweigh any potential benefits

5    associated with the design. As a result of its defective design and/or manufacture, an

6    unreasonable risk of severe adverse reactions can occur, including but not limited to:

7    foreign body  response; granulomatous response; allergic reaction; rejection; erosion;

8    excessive and chronic inflammation; adhesions to internal organs; scarification;

9    improper wound healing; infection; seroma; abscess; fistula; tissue damage and/or

10   death; nerve damage; chronic pain; recurrence of hernia; and other complications.

11       49.    Defendants omitted mention of Parietene Mesh's risks, dangers, defects,

12   and disadvantages when they advertised, promoted, marketed, sold and distributed

13   them as safe to regulatory agencies, health care providers, Plaintiff and other

14   consumers. But Defendants knew or should have known that Parietene Mesh was not

15   safe for its intended purposes, and that the mesh would and did cause serious medical

16   problems, including severe and permanent injuriesand damages.

17       50.    Defendants have underreported information about the propensity of

18   Parietene Mesh to fail and cause injury and complications; and have made unfounded

19   representations regarding the efficacy and safety of the mesh through various means and

20   media.

21       51.    Defendants knew or should have known that at all material times their

22   communications about the benefits, risks and adverse effects of Parietene Mesh,

23   including communications in labels, advertisements and promotional materials, were

24   materially false and misleading.

25       52.    Defendants'    nondisclosures,    misleading    disclosures,    and

26   misrepresentations were material and were substantial factors contributing directly to

27   the serious injuries and damages Plaintiff have suffered.

28

53.    Plaintiff would not have agreed to allow the implantation of Parietene Mesh had Defendants disclosed the true health consequences, risks and adverse effects caused by Parietene Mesh.

54.    Upon information and belief, Defendants failed to conduct adequate pre-market clinical testing and research, and failed to conduct adequate post-marketing surveillance to determine the safety of Parietene Mesh.

55.    Upon information and belief, Defendants failed to disclose on their warning labels or elsewhere that adequate pre-market clinical testing and research, and adequate post-marketing surveillance had not been done on Parietene Mesh, thereby giving the false impression that Parietene Mesh had been sufficiently tested.

56.    Parietene Mesh is defective due to Defendants' failure to adequately warn or instruct Plaintiff and his health care providers concerning at least the following subjects:

    a.  The Parietene Mesh's propensities for degradation and fragmentation.

    b.  The rate and manner of mesh erosion or extrusion in Parietene Mesh.

    c.  The risk of chronic inflammation resulting from Parietene Mesh.

    d.  The risk of chronic infections resulting from Parietene Mesh.

    e.  The Parietene Mesh would be "tension free" only at the time of implantation; and would drastically contract once implanted.

    f.  The risk of recurrent hernias, intractable hernia pain, and other pain resulting from Parietene Mesh.

    g.  The need for corrective or revision surgery to revise or remove the Parietene Mesh.

    h.  The severity of complications that could arise as a result of implantation of Parietene Mesh.

    i.  The hazards associated with Parietene Mesh.

    j.  Treatment of hernias with Parietene Mesh is no more effective than with feasible available alternatives; and exposes patients to greater risk than with feasible available alternatives.

    k.  Treatment of hernias with Parietene Mesh makes future surgical repairs more difficult than with feasible available alternatives.

l.  Use of Parietene Mesh puts patients at greater risk of requiring additional surgery than use of feasible available alternatives.

m.  Complete removal of Parietene Mesh may not be possible and may not result in complete resolution of the complications, including pain.

n.  The Parietene Mesh are cytotoxic, immunogenic, and/or non-biocompatible, causing or contributing to complications such as delayed wound healing, chronic inflammation, adhesion formation, foreign body response, rejection, infection, seroma formation, and others.

o.  Parietene Mesh significantly contracts and hardens post-implantation.

57.    The Parietene Mesh was at all times utilized and implanted in a manner foreseeable to Defendants: Defendants generated Instructions for Use for Parietene Mesh, created implantation procedures, and allegedly trained the implanting physicians. But Defendants provided incomplete and insufficient training and information to physicians regarding the use of Parietene Mesh, subsequent anatomical changes, and aftercare of patients, including Plaintiff.

58.    The Parietene Mesh implanted in Plaintiff was in the same or substantially similar condition as when it left Defendants' possession, and in the condition directed by and expected by Defendants.

59.    Upon information and belief, Defendants are in possession of information, such as data and reports from the Americas Hernia Society Quality Collaborative (AHSQC), that Defendants' Hernia Mesh Device results in significantly higher rates of numerous severe complications when compared to competitor hernia meshes. Defendants have not made such information public or disclosed such information to the FDA. Furthermore, upon information and belief, Defendants prohibit organizations, like AHSQC from releasing such information.

60.    As a result of having Parietene Mesh implanted, Plaintiff has experienced significant physical and mental pain and suffering, sustained permanent injury, undergone medical treatment and will likely undergo further medical treatment, and suffered financial or economic loss, including obligations for medical services and expenses, lost income, and other damages.

## ESTOPPEL AND TOLLING OF STATUTE OF LIMITATIONS

61.     Plaintiff incorporates the allegations in all prior paragraphs.

62.     Plaintiff asserts all applicable state statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations, including equitable tolling, class action tolling, delayed discovery, discovery rule, and fraudulent concealment.

63.     Plaintiff pleads that the discovery rule should be applied to toll the running of the statute of limitations until Plaintiff knew, or through the exercise of reasonable care and diligence should have known, of facts indicating his injury, the cause of the injury, and the tortious nature of the wrongdoing that caused the injury.

64.     Despite diligent investigation by Plaintiff into the cause of his injuries, including consultations with Plaintiff's medical providers, the nature of the injuries and damages, and their relationship to the Defendants' Parietene Mesh, it was not discovered, and through reasonable care and diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiff's claims. Therefore, under the appropriate application of the discovery rule, the action was filed well within the applicable statutory limitations period.

65.     The running of the statute of limitations is tolled due to equitable tolling. Defendants are estopped from asserting a limitations defense due to their fraudulent concealment, through misrepresentations and omissions, from Plaintiff and Plaintiff's physicians of the true risks associated with the Defendants' Parietene Mesh. As a result of Defendants' fraudulent concealment, Plaintiff and his physicians were unaware, and could not have known or have learned through reasonable diligence, that Defendants had failed to disclose the true risks and complications associated with Parietene Mesh, and the injuries Plaintiff suffered were a direct and proximate result of Defendants' wrongful acts and omissions.

## PUNITIVE DAMAGES

66.    Defendants acts and omissions as described hereinabove were malicious, oppressive and/or fraudulent and were done with a conscious disregard for the rights, health and safety of Plaintiff and the public at large.

67.    Defendants' malicious, oppressive and/or fraudulent acts and omissions include:

a.    Marketing and selling the Parietene Mesh products to health care providers, including Plaintiff's physician without conducting adequate testing to ensure the product was safe and efficacious;

b.    Defendants knew their Devices posed unreasonable risks, including degradation, excessive and chronic inflammation, inadequate or complete failure to incorporate in tissue, adhesion formation, migration, infection, erosion, abscess, fistula formation, nerve damage,excessive scarification, contracture, shrinkage, breakage, and other harm-causing defects, but failed to disclose these risks to Plaintiff, Plaintiff's physician and the public;

c.    Defendants attempted to misrepresent, and did misrepresent,facts concerning the safety of their Parietene Mesh, including adverse data and informationfrom studies and testing conducted with respect to Parietene Mesh, which showed that the risks and dangers associated with Parietene Mesh were unreasonable.

d.    Defendants' misrepresentations, omissions, and partial disclosures, included knowingly withholding material information from the medical community and the public, including Plaintiffs, concerning the safety and efficacy of Defendants' Parietene Mesh.

68.    At all material times, Defendants knew and intentionally and/or recklessly disregarded the fact that their Parietene Mesh caused severe and potentially permanent complications with greater frequency than safer and feasible alternative devices or treatments.

69.    Notwithstanding that knowledge, Defendants continued to market Parietene Mesh to consumers without disclosing the true risk of side effects and complications, or the frequency, severity and duration of those risks.

70.    Defendants knew of Parietene Mesh's defective and unreasonably dangerous nature. But they continued to manufacture, produce, assemble, market,

distribute, and sell Parietene Mesh, and failed to include adequate warnings about them. Defendants' acts and omissions were taken with reckless disregard of the foreseeable harm caused by Parietene Mesh, so as to maximize sales and profits at the expense of the health and safety of the public, including Plaintiffs.

71.    Under California law, Defendants' acts and omissions, if proven by clear and convincing evidence, suffices to justify the award of punitive damages.

## FIRST CAUSE OF ACTION

### STRICT LIABILITY – FAILURE TO WARN

### (Against all Defendants)

72.    Plaintiff incorporates by reference the allegations in all prior paragraphs.

73.    Defendants researched, developed, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce the Parietene Mesh and in the course of same, directly advertised or marketed Parietene Mesh to the FDA, healthcare professionals, consumers, and persons responsible for consumers, and therefore had a duty to warn of the risks associated with the use of these products.

74.    Parietene Mesh is inherently and unreasonably dangerous.

75.    Defendants knew or should have known of these dangers, given the generally recognized and prevailing scientific knowledge available at the time of the manufacture and distribution of Parietene Mesh.

76.    Defendants failed to provide adequate warning of the dangers created by the reasonably foreseeable use of these implants.

77.    At the time the Parietene Mesh was implanted in Plaintiff, Defendants' warnings and instructions for Parietene Mesh was inadequate and defective. As described in this Complaint, there was an unreasonable risk that the Parietene Mesh would not perform safely and effectively for the purposes for which it was intended. Defendants failed to design and/or manufacture against such dangers and failed to provide adequate warnings and instructions concerning these risks.

78.     Defendants failed to properly and adequately warn and instruct Plaintiff and his health care providers concerning the risks of their Parietene Mesh, given Plaintiff's conditions and need for that information. Neither Plaintiff nor Plaintiff's physicians were aware of the defects and dangers of Parietene Mesh, including the frequency, severity and duration of the risks associated with these products.

79.     Defendants also failed to properly and adequately warn and instruct Plaintiff and his health care providers concerning the inadequate research and testing of Parietene Mesh, and the complete lack of a safe, effective procedure for removal of Parietene Mesh.

80.     Specifically, Defendants' failed to warn Plaintiff, Plaintiff's physicians and others of the following risks associated with Parietene Mesh:

a.     The propensity of Parietene Mesh to contract or shrink in-vivo;

b.     Parietene Mesh's propensity to degrade fragment and disintegrate;

c.     The rate and manner of mesh erosion or extrusion;

d.     The risks of a chronic inflammatory response or other immunologic response, pain, dehiscence, encapsulation, rejection, migration, scarification, contraction, adhesion to internal organs and viscera, erosion through adjacent tissue and viscera, infections, bowel obstruction, or hernia incarceration or strangulation;

e.     Defendants failed to warn that Parietene Mesh would degrade in the presence of an infection, creating an even more habitable structure for the infection to thrive;

f.     The necessity for invasive surgical intervention in the event of complications and that Defendants' failed to train physician how to properly treat such complications when they occur and fail to train physicians to remove Parietene Mesh when removal of the mesh is necessary;

d.     That the surgical removal of Parietene Mesh in the event of complications would leave the hernia unrepaired and much larger than the original; and would necessitate further, more complicated medical treatment to attempt to repair the same hernia that the

failed product was intended to treat.

h.  The lack of data on how the Hernia Mesh Device performs in humans short-term and long-term;

i.  The unusually high rate of infection associated with the Hernia Mesh Device;

j.  The risk associated with collagen film;

k.  Dense adhesions;

l.  That loose and filmy adhesions would become denser over time;

m.  That dense adhesions to all small percentage of the meshes surface results in the same rate of severe complications, such as bowel obstructions, erosion, bowel resections, chronic pain, and infection, compared to a mesh entirely covered in dense adhesions;

n.  That severe complications as a result of dense adhesions to the mesh are frequently latent, in that symptoms don't manifest for years or even decades;

o.  That the profound inflammatory response to polypropylene;

p.  Organ perforation;

q.  Bowel obstruction;

r.  Seromas;

s.  Fistulas;

t.  The frequency of long-term recurrence;

u.  The propensity of the Parietene Mesh to contract, retract, deform, and/or shrink inside the body;

v.  The propensity of the Hernia Mesh Device to degrade, fragment, fray, unravel, and/or disintegrate;

w.  The risk of chronic inflammation resulting from Parietene Mesh;

x.  The risk of systemic complications from uncontrolled chronic inflammation;

y.  The potential mesh failure modes and injuries caused by chronic

inflammation;

z.    The risk of chronic, and untreatable infections;

aa.    The risk of chronic, debilitating, and intractable pain;

bb.    The likely need for corrective or revision surgery to adjust or remove the Parietene Mesh within a decade;

cc.    That the Parietene Mesh would likely fail during the lifetime of the patient requiring additional and more complex surgeries;

dd.    The possibility that the mesh is not fully removable;

ee.    The severity of complications that could arise if the Mesh is removed;

ff.    The severity of complications that could arise as a result of the implantation of Parietene Mesh;

gg.    The hazards associated with Parietene Mesh;

hh.    Treatment with Parietene Mesh is no more effective than feasible, available alternatives;

ii.    Treatment with Parietene Mesh exposes patients to greater risk than feasible, available alternatives;

jj.    Use of Parietene Mesh puts the patient at a greater risk of requiring additional surgery than feasible, available alternatives;

kk.    Complete removal of the Mesh may not result in complete resolution of the complications, including pain; and

ll.    Complete removal of the Mesh may not be possible.

81.    Defendants expected and intended Parietene Mesh to reach Plaintiff, their health care providers, and other consumers in the condition in which the Parietene Mesh was sold.

82.    If Plaintiff and/or Plaintiff's physicians had been properly warned of the defects and dangers of Parietene Mesh, and of the frequency, severity, and duration of the risks associated with these Parietene Mesh, Plaintiff would not have consented to

allow these Parietene Mesh to be implanted, and Plaintiff's physician would not have implanted Defendants' Parietene Mesh in Plaintiff.

83.    As a direct and proximate result of the inadequate and defective warnings and instructions, Plaintiff suffered injuries and damages as summarized in this Complaint.

## SECOND CAUSE OF ACTION
## NEGLIGENCE
### (Against all Defendants)

84.  Plaintiff incorporates by reference the allegations in all prior paragraphs as if fully set forth herein.

85.  Defendants had a duty to exercise reasonable care in designing, testing, manufacturing, packaging, marketing and labeling, including the preparation of adequate and complete written instructions and warnings for Parietene Mesh.

86.  Defendants failed to exercise reasonable care in carrying out these activities. Defendants knew, or in the exercise of reasonable care should have known, that their Parietene Mesh was defectively and unreasonably designed and/or manufactured, and was unreasonably dangerous and likely to injure patients in whom it was implanted.

87.    Defendants knew or should have known that Plaintiff and his physician were unaware of the dangers and defects inherent in Parietene Mesh.

88.    Defendants knew or should have known that Parietene Mesh caused unreasonable harm and dangerous side effects that many users would be unable to remedy by any means. Nonetheless, Defendants continued to promote and market these products use by consumers, including the Plaintiff.

89.    Defendants' negligent, reckless and/or wanton acts include:

   a.  Failing to conduct adequate pre-market clinical testing and research;

   b.  Failing to conduct any randomized, clinical testing on the efficacy and safety of the implants before releasing the implants for public use;

   c.  Failing to conduct adequate post-market surveillance to determine the

safety of the implants;

        d.   Failing to utilize medical grade polypropylene in the manufacture of Parietene Mesh;

        e.   Utilizing implants with low porosity, which decreases even more when the implants are placed under mechanical stress;

        f.   Utilizing implants with very small interstices which allow bacteria to enter and hide from white blood cells and macrophages—the host defenses designed to eliminate bacteria. The bacteria also secrete an encasing biofilm, serving to further protect them from destruction by white blood cells and macrophages. In addition, some bacteria are capable of degrading polypropylene;

        g. Utilizing mesh implants with a large surface area of polypropylene which promotes wicking of fluids and bacteria, and is a "bacterial superhighway" providing a safe haven for bacteria;

        h.  Utilizing polypropylene implants that are not inert and will degrade, flake, chip, and disperse throughout the body after implantation;

        i.   Failing to use due care in the design and/or manufacture of their implants so as to avoid the risks and complications discussed herein;

        j. Failing to properly and adequately monitor the post-market performance of their implants;

        k.   Failing to recommend monitoring of patients implanted with the Parietene Mesh for the risks and complications discussed herein;

        l. Aggressively promoting, marketing and/or selling their implants despite their knowledge of the risks associated with these implants;

        m.   Failing to conduct adequate post-market surveillance and/or to respond to post-market surveillance of complications and injuries associated with their implants;

        n. Failing to ensure their implants are accompanied by adequate and complete warnings regarding all possible adverse effects and risks associated with their implants;

        n. Failing to utilize medical grade polypropylene in the manufacturer of Parietene Mesh and instead utilizing polypropylene which carried a Material Safety Data Sheet (MSDS) prohibited its use in permanent medical implants;

        o.  Utilzing polypropylene that induces a severe inflammatory response

once implanted, and continues to induce a severe inflammatory response indefinitely or until removed.

        p.   Utilizing polypropylene that flakes off and migrates throughout the body also incites its own chronic inflammatory response wherever it embeds;

        n. Engaging in activities to prevent the disclosure of all complications associated with their implants to Plaintiff, Plaintiff's physicians and the public;

        o.   Engaging in acts and omissions to prevent the disclosure of the severity, duration and prevalence of complications associated with their implants to Plaintiff, Plaintiff's physicians and the public;

        p.   Under-reporting, underestimating or downplaying the serious dangers and risks of their Parietene Mesh;

        q. Failing to use reasonable and prudent care in statements regarding the efficacy, safety and risks of their implants, which were knowingly false and misleading; and

        r. Failing to update warnings about serious risks and complications associated with their implants in a timely manner.

90.    Defendants were also negligent, reckless and/or wanton by failing to disclose and/or warn Plaintiff, Plaintiff's physicians and the public of:

        a.   The propensity of their implants to degrade, depolymerize and stress crack;

        b.   The propensity of their implants to cause chronic inflammatory reaction;

        c.   The weave of their implants creates very small interstitial spaces in the mesh which are large enough for bacteria to enter but too small for the body's infection defenses (white blood cells and macrophages) to enter, allowing bacteria to easily colonize the mesh. In addition to infecting the mesh, the bacteria and the body's reaction to it, can cause oxidative degradation of the polypropylene, stress cracking and inflammatory reactions;

        d.   The inflammatory reaction caused by the mesh causes the body to secrete acids which can cause oxidative degradation and loss of compliance or strength of the implant

        e.  All complications and risks associated with Parietene Mesh implants;

       f.   The severity, duration and prevalence of complications associated with their implants to Plaintiff, Plaintiff's physicians and the public;

       g.  The Parietene Mesh implants are not inert and will degrade, flake, chip, and disperse throughout the body after implantation;

       h.  That the implants were manufactured using non-medical grade polypropylene;

       i.  The Parietene Mesh implants cause a severe inflammatory response once implanted, and continues to induce a severe inflammatory response indefinitely or until removed.

       j.   The Parietene Mesh implants are comprised of polypropylene that flakes off and migrates throughout the body also incites its own chronic inflammatory response wherever it embeds.

91.    Defendants knew or should have known that their failure to exercise ordinary care in the manufacture, design, packaging, labeling, the creation of warnings and instructions, sale, marketing and distribution of Parietene Mesh, and their training of health care providers to implant Parietene Mesh or to treat Device complications, would cause foreseeable harm, injuries, and damages to individuals implanted with Parietene Mesh, including Plaintiffs.

92.    Defendants knew, or in the exercise of reasonable care should have known, that Parietene Mesh was defectively and unreasonably manufactured and/or designed, and was unreasonably dangerous and likely to injure patients in whom Parietene Mesh was implanted. Defendants knew or should have known that Plaintiffs and their health care providers were unaware of the dangers and defects inherent in Parietene Mesh.

93.    Defendants' Parietene Mesh caused Plaintiff to suffer injuries.

94.    Plaintiffs suffered injuries as a result of Defendants' failure to exercise reasonable  care in designing, manufacturing, producing, marketing, labeling, packaging and selling, and creating instructions or warnings for Parietene Mesh.

95.    Defendants' actions constitute negligence under the common law of all states.

96.    Defendants' negligence proximately caused the damages and injuries to

Plaintiffs.

97.    As a direct and proximate result of Defendants' negligence in designing, testing, inspecting, manufacturing, packaging, labeling, marketing, distributing and training, and preparing inadequate and improper written instructions and warnings for Parietene Mesh, Plaintiffs have been injured and undergone medical treatment, and will likely undergo future medical treatment and procedures, sustained severe and permanent physical and mental pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and consortium, economic loss, and damages, including, but not limited to, medical expenses, lost income, other damages.

98.    Plaintiff is entitled to recover compensatory, non-compensatory, punitive, and all other damages available under law for injuries resulting from Defendants' negligence, carelessness, wantonness and recklessness.

## PRAYER FOR RELIEF

Plaintiff demands judgment against Defendants, and each of them, individually, jointly and severally and prays for the following relief in accordance with the applicable law and equity, and in an amount exceeding $500,000:

i.    General and Compensatory damages to Plaintiff for past, present, and future damages, including, but not limited to, pain and suffering for severe and permanent personal injuries sustained by Plaintiff, permanent impairment, mental pain and suffering, loss of enjoyment of life, past and future health and medical care costs and economic damages including past and future lost earnings and/or earning capacity together with interest and costs as provided by law;

ii.    Punitive or exemplary damages for Defendants' wanton, willful, fraudulent, and reckless acts, established by their demonstration of complete disregard and reckless indifference for the safety and welfare of Plaintiff and the general public, in an amount sufficient to punish Defendants and deter future similar conduct;

iii.    Special Damages;

iv.    Statutory damages as set forth above;

v.    Restitution and disgorgement of profits;

vi.    Reasonable attorneys' fees as provided by law;

vii.   The costs of these proceedings, including past and future cost of the suit incurred herein;

viii.  All ascertainable economic damages;

ix.    Pre-judgment interest on all damages as is allowed by law;

x.     Post-judgment interest; and

xi.    Such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

This 25th day of May, 2022                    Respectfully submitted,

                                              /s/ Chris W. Cantrell
                                              Chris W. Cantrell (SBN 290874)
                                              William J. Doyle, II (SBN 188069)
                                              **DOYLE APC**
                                              550 West B Street, Fourth Floor
                                              San Diego, CA 92101
                                              Telephone: (619) 736-0000
                                              Facsimile: (619) 736-1111